IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

5566 FURNISHINGS, LLC d/b/a                                          PLAINTIFF
ALLIANCE CORPORATE FURNISHINGS

v.                                         CIVIL ACTION NO. 1:20-CV-205-GHD-RP

SCHNEIDER NATIONAL CARRIERS, INC.                                   DEFENDANT

## MEMORANDUM OPINION

The Plaintiff initiated this civil action on August 3, 2020, by filing its Complaint [2] in the

Circuit Court in Lowndes County, Mississippi, pursuing state law claims for breach of contract;

trespass to chattels, or in the alternative, conversion; and breach of good faith and fair dealing.

The Defendant removed the action to this Court on October 14, 2020, premising federal

jurisdiction on diversity of citizenship. *See* Notice of Removal [1]. Now before the Court is the

Defendant's Motion [38] for Summary Judgment as to all the Plaintiff's claims. The parties have

briefed the Defendant's motion and the Court is prepared to rule.

*Facts and Procedural Background*

The Plaintiff operates an online retail furniture sales business. After a customer places an

order, the Plaintiff orders the product from a supplier and, through a third-party shipping service,

delivers the product to the customer. The Defendant is a logistics and transportation services

company that previously provided first to final mile ("FTFM") services to the Plaintiff. Under the

FTFM services model, the Defendant or its affiliates would contract with local delivery companies

to pick up goods from a warehouse or another central location and deliver those goods to the

customers. The Defendant asserts that it had no control over items that those local delivery

companies had in their possession. As part of the parties' relationship, the Plaintiff would pay the

Defendant once the Defendant picked up an item to be shipped; the Defendant would then deliver

the item directly to the customer or would deliver the item to a third-party trucking service that would in turn deliver the item to the customer. In late 2018, the Plaintiff began using the Defendant's services to deliver products to the Plaintiff's customers.

The parties executed two separate agreements. The first was the Master Signature Sheet which encompassed several documents "including the Final Mile Rates, Final Mile Accessorials, Final Mile Depositions, First Mile Accessorials, and FSC Table and Claims Policy (collectively, the "Rate Sheet")." [39] at p. 3. The Rate Sheet established the rates the Plaintiff would pay the Defendant for its delivery services, but it did not include any requirement for the Defendant to accept products for shipment nor did it include a notice of termination provision. The second was the Cargo Claims Policy for First-to-Final Mile Shipments which governed "the filing, processing, and disposition of cargo claims for all first to final mile . . . Shipments" the Defendant "and/or its' (sic) Affiliates' respective delivery agents" performed. [38], Ex. 1 at Ex. 6 p. 1. Under the Cargo Claims Policy, the Plaintiff was able to submit claims for properties that were allegedly damaged in the distribution process. Unlike the Rate Sheet, the Cargo Claims Policy *did* include a termination provision which provided a 30-day notice requirement; however, the parties both acknowledge that there was no provision that required the Defendant to accept any shipments. However, the Plaintiff avers that, throughout the parties' relationship, the Defendant accepted every order the Plaintiff ever placed with the Defendant and that, if for some reason the Defendant had any particular issues with an order, it communicated with the Plaintiff to express those issues.

On August 1, 2019, the Defendant notified the Plaintiff and all its other customers that, effective immediately, it would no longer be offering its FTFM services. This lawsuit centers around the handling of the outstanding orders at that time as well as the additional damages the Plaintiff claims occurred because of the abrupt end to the delivery service. The parties dispute

2

how remaining orders were handled once the Plaintiff learned of the Defendant's decision to stop those services. The Defendant sent an initial email on August 7, 2019, which read in pertinent part as follows:

> Please let us know if you plan to have the product disposed or donated of (sic) by 08/12. If you plan to have it picked up from the delivery agent by a third party service please let us know by 08/15. If we do not hear back by that point, the product will need to be dealt with at the discretion of the agent.

[38], Ex. 1 at p. 57.

The parties then exchanged a series of emails in which the Plaintiff asked about reimbursement and requested that the Defendant return the products to the Plaintiff's warehouse. The Defendant notified the Plaintiff that it would not itself be able to return the products to the Plaintiff because the products were in the hands of the Defendant's various third-party carriers. But the Defendant advised the Plaintiff that it would provide the necessary information to any carrier the Plaintiff might hire to assume and carry out the delivery obligations. The parties were unable to reach an agreement regarding the distribution, and the Plaintiff never received those items.

Despite the FTFM services ending on August 1, 2019, the Plaintiff was able to place claims with the Defendant through its Cargo Claims Policy beyond that date. In other words, although the Defendant no longer offered its FTFM delivery services, the parties' relationship persisted such that the Defendant would have still worked with the Plaintiff to address any outstanding claims the Plaintiff had with the Defendant under the terms of the Cargo Claims Policy. One of the Defendant's claims department employees emailed the Plaintiff on September 6, 2019, attempting to settle both known and unknown outstanding claims the Plaintiff had with the Defendant. The parties then exchanged a series of emails regarding the amount the Plaintiff would be paid for

various claims. The Defendant ultimately sent a check to the Plaintiff as a settlement amount, but the parties dispute which claims were settled based on the amount provided. The Defendant told the Plaintiff not to cash the check if it did not agree with the settlement amount; however, despite receiving this email, the Plaintiff cashed the check. The Plaintiff now brings suit against the Defendant for claims arising under Mississippi law including breach of contract (express and implied); trespass to chattels, or in the alternative, conversion; and breach of good faith and fair dealing. The Defendant seeks dismissal of all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324, 106 S. Ct. 2548 (citation omitted). "Mere 'conclusory allegations, speculation, [or] unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.'" *Pree v. Washington County Board of Supervisors*, 2018 WL 522776, at *6 (N.D. Miss. Jan. 23, 2018) (citing *Chen v. Ochsner Clinic Foundation*, 630 Fed. Appx. 218, 222-23 (5th Cir. 2015) (citing *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996)).

*Analysis*

As noted above, the Plaintiff brings claims arising under Mississippi law including breach of contract (express and implied – Count I of the Plaintiff's complaint); trespass to chattels, or in the alternative, conversion (Count II); and breach of good faith and fair dealing (Count III). The Defendant argues that summary judgment should be granted in its favor for five reasons:

> First, Plaintiff knowingly accepted a settlement from Schneider "for full and final payment of all FTFM claims" so its claims are barred by an accord and satisfaction.
>
> Second, the undisputed evidence shows that Schneider had no contractual obligation to accept freight from Plaintiff or provide advance notice of its decision to discontinue FTFM services.
>
> Third, Plaintiff has no evidence of bad faith to support its covenant of good faith and fair dealing claim and cannot use that theory to impose contract terms that the parties did not bargain.
>
> Fourth, Plaintiff's trespass and conversion claims are preempted by the Carmack Amendment.
>
> Fifth, it is undisputed that Schneider delivered all the shipments that it had accepted prior to the shutdown and provided Plaintiff with multiple opportunities to recover customer returns that were in the possession of its third-party delivery agents; thus, Schneider committed no trespass or conversion.

[39] at pgs. 1-2. The Court shall address these arguments in turn.

5

I.      *Accord and Satisfaction*

As noted above, the Defendant claims that the doctrine of accord and satisfaction bars the Plaintiff's claims. Four elements must be met for there to be a valid accord and satisfaction in Mississippi. *Cohen v. First Bank*, 2018 WL 1321042, at *9 (S.D. Miss. Mar. 14, 2018). The four elements are as follows:

> (1)     something of value offered in full satisfaction of demand;
>
> (2)     accompanied by acts and declaration as amount to a condition that if the thing offered is accepted, it is accepted in satisfaction;
>
> (3)     the party offered the thing of value is bound to understand that if he takes it, he takes subject to such conditions; and
>
> (4)     the party actually does accept the item.

*Id.* (quoting *Wallace v. United Miss. Bank*, 726 So.2d 578, 589 (Miss. 1998)).

Additionally, "an accord and satisfaction 'must have all the essentials of a contract and may be express, or implied from the circumstances.'" *Id.* (quoting *Wallace*, 726 So.2d at 589 (quoting *Cook v. Bowie*, 448 So.2d 287 (Miss. 1984)). "The burden of proving an accord and satisfaction is upon the one who maintains the affirmative of that issue, and must be proven by clear and convincing evidence." *Id.* (quoting *Wallace*, 726 So.2d at 590 (internal citation and quotation marks omitted)).

Here, the parties communicated through email to discuss the settlement of the Plaintiff's claims with the Defendant. The emails read as follows:

> **The Defendant, September 6, 2019, at 3:48 p.m.:**
>
> Dear Sirs,
>
> As you are aware, Schneider's First to Final Mile business has been discontinued. I work in the claims department and am reviewing outstanding claims filed by ACF Wholesale. I would like to speak

to someone at your company about the potential settlement for any and all known and unknown outstanding claims prior to the (sic) our final of 9/30/19 . . .

My current records indicate we have 18 claims open with a value of $3793.21.

ACF Wholesale claims history indicates that we have settled 23 past claims submitted in the amount of $9997.88 at 38%, or $3765.00.

With this information, I'd like to make an offer to settle any and all pending and future unknown claims. Rather than the 38% we have paid in the past, I would like to extend an offer of 50% of the current outstanding, or approximately $1,900.

Once you have had a chance to review this information, please advise. I look forward to hearing from you.

Sincerely,

Amy S. Kroll

**The Plaintiff, September 9, 2019, at 1:46 p.m.:**

Good afternoon Ms. Kroll,

After gathering all the details of our claims we found closer to $5,000 in outstanding claims as of today. Out of this, there are seven claims that total $1,928 that are either noted as visual damage at the time of delivery, shorted deliveries or lost in transit where 100% would be covered on each of these claims. This total of $1,928 does not include the freight cost that would also be credited back on each of these claims. We can do further research to find out the cost of freight for each of these if needed. However, since 100% of these would be covered along with the chance of 1/3 of the others. We are requesting you consider a higher amount in order for us to settle. These last few weeks of deliveries with you shutting down the residential side were quiet (sic) hectic and we experience three times the amount of damage claims within just a matter of a few weeks.

Please also be aware that there is also over $12,000 in products they (sic) stayed on your doc and were never returned to us that we will need to do claims on. We understand the shutting down of the residential side, however, we are a business and there is no reason

7

why our merchandise should not have been returned to our business location.

Thanks for your time and consideration! We are truly hoping we can come to some type of resolution.

Thanks!

**The Defendant, September 9, 2019, at 6:48 p.m.:**

I certainly understand your frustration. However, I am only in a position to make an offer on those claims that are substantiated. Do you intend to file claims for the $12K in product? How quickly can you get the claims filed?

Thank you,

Amy S. Kroll

**The Plaintiff, September 10, 2019, at 9:10 a.m.:**

Good Morning,

We are currently wanting to settle with all existing claims. We are asking for the $1928 on the existing claims where there was either visual damage, shortage or lost in transit status, along with the freight cost associated with these claims. Any future claims as previously mentioned can be dealt with at a later date. At this time we wish to settle only the substantiated claims. Please let me know if we can work together on this at this time.

Thanks!

**The Plaintiff, September 10, 2019, at 9:13 a.m.:**

. . . Just to clarify [the Plaintiff] is talking about the claims that should be paid in full with shipping covered as well.

Thank You,

Chad

**The Defendant, September 10, 2019, at 12:17 p.m.:**

I understand and certainly respect your position. At this time, however, I am only working on those accounts that we are able to obtain full and final settlement of all known and unknown claims. Based on your response, I think it is best to hold your account open to give more time to present the claims you believe are forthcoming. We will continue to work your account on a claim by claim basis as we get to them until a final settlement can be reached. In the meantime, however, I'll ask that you revise the claim amount you are requesting since you are now aware of the freight charges. Our audit process will require the existing claims to accurately reflect the actual amount you are claiming.

Thank you for your patience and understanding.

Amy S. Kroll


**The Plaintiff, September 17, 2019, at 11:10 a.m.:**

Good Morning Ms Kroll

Please advise on who we should contact in regards to these outstanding claims? We have tried contacting Ms. Susan Alridge, however, those phone lines have been shut down. We have received no correspondence on these outstanding claims in weeks. If we need to proceed in an alternative way we can do so, however, we would like to finalize these claims in a peaceful manner.

We will be awaiting your response.

Thanks!


**The Defendant, September 17, 2019, at 11:52 a.m.:**

Susan is no longer with the company. I corresponded with someone on 9/10/19 about potentially settling the claims, but there were going to be additional claims filed. Have you been able to pull the additional claims together? I am only showing 18 open, which is the same amount as when I first reached out to you.

Amy S. Kroll

**The Plaintiff, October 1, 2019, at 8:52 a.m.:**

We have now submitted all claims. Please advise us on the next steps because for some reason we do not see any movement on any of these claims.

Thanks!

**The Defendant, October 1, 2019, at 12:53 p.m.:**

Thank you for your inquiry.

My exports indicate you were able to amend your claims to include the freight charges. Therefore, we reflect that ACF Wholesale has 21 open claims with a value of $9,132.69.

ACF Wholesale claims history indicates that we have settled 23 past claims submitted in the amount of $9997.88 at 38%, or $3,765.00.

With this information, I'd like to make an offer to settle any and all pending and future known claims. Rather than the 38% we have paid in the past, I would like to extend an offer of 50% of the current outstanding, or $4,566.35.

Please review this offer and contact me as soon as possible.

Amy S. Kroll

**The Plaintiff, October 2, 2019, at 3:29 p.m.:**

We will accept the offer of 50% of the current outstanding, or $4,566.35. Please let us know how else we need to further proceed.

Thanks!

**The Defendant, October 4, 2019, at 9:06 a.m.:**

Thank you! There is nothing else needed – I will get the check out to you and close the files.

Sincerely,

Amy S. Kroll

**The Plaintiff, October 14, 2019, at 8:09 a.m.:**

I received the check today. It stated on the invoice that it was for full and final payment of all FTFM claims. I am appreciative of the check. However, we only stated that this was just for the outstanding ones noted. Not any future ones.

Thank You,

Chad

**The Defendant, October 14, 2019, at 8:39 a.m.:**

Please do not cash the check if you do not agree to the terms of full and final settlement as highlighted below.

The reason for the increased offer (12% additional) was to compensate for any future claims that should arise.

The business is shutdown and therefore, we need to finalize all aspects. The check is good for several months, so if you prefer to wait and see if any additional claims arise, you could wait to cash it?

Your thoughts?

Amy S. Kroll

[38], Ex. 1 at pgs. 68-77.

Despite receiving the Defendant's October 14, 2019, email, Chad Moody, one of the owners of ACF Wholesale who was involved in the email communications above, proceeded to cash the check the following day. Further, Moody acknowledged in his deposition that he was aware of the Defendant's directions in regard to cashing the check.

**Q:** All right. But you did cash the check, didn't you?

**A:** I did. There was – I mean, my hands were tied, and things are tight, and they owed us for those damages, just the damaged product on that one, on that check.

**Q:** What do you mean your hands were tied?

11

**A:** Like things were tight. I mean, like, that's a $5,000 check essentially that they're giving me and – for the damages that were owed to me. I didn't want to accept 50 percent of that, but we had agreed to it and I did. But then she was saying that it was for all future ones as well which is what I did not agree to. So I cashed it on the basis that it was on the claims that we submitted which she stated in that – that email, the 21 that we submitted. Does that make sense?

**Q:** I think so, yeah. She told you on October 14th . . .

**A:** Yeah. She said don't cash it if we weren't in agreement with it.

**Q:** Correct.

**A:** So I guess we already had or – yeah, it looks like it. It looks like we –

**Q:** All right . . .

[38], Ex. 1 at pgs. 48-49.

The Plaintiff argues that cashing the check did not serve as an accord and satisfaction of *all* its claims against the Defendant. Specifically, the Plaintiff asserts that the emails between the parties indicate that they were negotiating a resolution to the Plaintiff's "damage claims for products" not for all potential claims the Plaintiff might have against the Defendant. [43] at p. 12. The Plaintiff also argues that there was no meeting of the minds—an element of contract formation and thus a required element for an accord and satisfaction. Further, the Plaintiff argues that the communications were ambiguous and thus prevented the communications from successfully operating as an accord and satisfaction.

Based on Moody's testimony, it is clear he understood that the Defendant's purpose in issuing the check was to settle *all* FTFM claims, including future claims, but chose to cash the check anyway. Mississippi courts have extensively addressed whether cashing a check constitutes an accord and satisfaction. *See Triangle Construction Co., Inc. v. Fouche and Associates, Inc.,*

218 So.3d 1180, 1185 (Miss. Ct. App. 2017) ("However, Mississippi law is clear that, despite whatever contentions a party may make to the contrary, cashing a check marked 'final payment' constitutes an accord-and-satisfaction agreement, which precludes that party from bringing future claims for additional payment."); *Gibson v. Shoemake*, 282 So.3d 458, 466 (Miss. Ct. App. 2019) ("[W]e find that Gibson, on behalf of the Appellants, accepted and cashed the check, marked as the final payment of the contract. By doing so, the chancellor held that Randy's contractual obligations were extinguished pursuant to the doctrine of accord and satisfaction. Upon review of the record, we find that substantial evidence supports the chancellor's conclusions."); *Dix v. Trigger Contractors, Inc.*, 337 So.2d 694, 697 (Miss. 1976) ("The cashing of the $1,500 check, conditioned by the debtor as 'Final Payment,' constituted an accord and satisfaction."), *Lovorn v. Iron Woods Products Corp.*, 362 So.2d 196, 197-98 (Miss. 1978) ("On these circumstances, Lovorn cannot be allowed to assert his claim for additional sums after having accepted, endorsed, and negotiated the check which was obviously tendered in full settlement. Having dealt with the check in such a manner and accepting the proceeds of the check, Lovorn is now precluded from recovering further sums related to dates prior to the date of the check."); *see generally McCarver v. Bogan*, 299 So.3d 844, 849 (Miss. Ct. App. 2020) ("In *D.R. Dix* and *Triangle*, the creditors understood they were accepting a check valued at an amount less than what they were owed. In the instant case, McCarver's unrebutted affidavit articulates that he did not discuss a 'full and final settlement' with the adjustor before or at the time the check was issued.").

Here, the Plaintiff's understanding of the purpose of the check was clear. Such an understanding is not ambiguous, and simply because Moody chose to disregard the Defendant's email does not mean there was no meeting of the minds as to the Defendant's purpose for sending the check. Ultimately, the Court sees that the Plaintiff's receipt of the check, the Plaintiff's receipt

of the email correspondence, and the Plaintiff's decision to cash the check anyway meets the four required elements of an accord and satisfaction. *See Reed*, 192 F.Supp.2d at 647. As a result, the check served as an accord and satisfaction for all the Plaintiff's FTFM claims.

However, the Court notes that the Plaintiff raises more than just FTFM claims for lost or damaged goods in its Complaint [2]. For example, the Plaintiff claims that the Defendant is liable for the damage it suffered to its reputation and the loss of goodwill, the revenue and potential profit it lost from losing customers, and refunds and cancellations that resulted. Although the Court finds that accord and satisfaction bars the Plaintiff's right to recover for the claims under the FTFM model — both the outstanding and any future claims that might have arisen due to loss or damage of shipments — the parties did not discuss the other damages which the Plaintiff alleges in this lawsuit. Therefore, accord and satisfaction does not apply to those claims. To the extent the Defendant's accord and satisfaction argument is directed toward the FTFM claims, summary judgment is granted.[1] The accord and satisfaction argument is denied as to any claims unrelated to the FTFM claims, and the Court will consider the Defendant's remaining summary judgment arguments pertaining to those claims.[2]

---

[1]      The Plaintiff raises a claim for trespass to chattels or, in the alternative, conversion in its Complaint [2]. The Court notes that these claims deal with the Plaintiff's loss of the product that was allegedly supposed to be shipped. However, the Cargo Claims Policy addresses any claims the Plaintiff may have related to the loss of or damage to a product. As a result, the trespass to chattels/conversion claim was covered under the accord and satisfaction for all the Plaintiff's claims under the FTFM model. The Defendant's request for summary judgment as to the Plaintiff's claim for trespass to chattels or, in the alternative, conversion is therefore likewise granted and those claims shall be dismissed.

[2]      To be clear, the Court notes that the Plaintiff's Complaint [2] includes a request for damages for the cost of the items that were allegedly in the Defendant's possession which the Defendant did not ship back to the Plaintiff as the Plaintiff requested. In the Court's view, these alleged damages were clearly contemplated by the parties because those claims/damages were expressly referenced in the parties' emails. Therefore, the Plaintiff's claims for these damages are subject to the accord and satisfaction and shall be dismissed.

## II. The Plaintiff's Breach of Contract Claims

The Plaintiff asserts that the Defendant breached a contract between the parties under two theories: (1) that the Defendant breached an express contract, and (2) that the Defendant breached a contract implied in fact. As the Defendant points out, these theories are clearly contradictory to one another. Namely, if the Plaintiff argues that there was an express contract, then it cannot argue that there was an implied contract between the parties, and *vice versa*. Ultimately, the Plaintiff claims that the Defendant breached its contract with the Plaintiff when it stopped its FTFM services without giving any warning to the Plaintiff and by accepting orders and payments from the Plaintiff without delivering some of the items to customers or returning those undelivered items to the Plaintiff. The Court will nonetheless address each of these arguments in turn.

### a. Breach of an Express Contract

Under Mississippi law, "[a] breach-of-contract case has two elements: (1) 'the existence of a valid and binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K&A Enterprises of Mississippi, LLC*, 250 So.3d 402, 414 (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So.3d 1221, 1224 (Miss. 2012)). Here, the Plaintiff argues that the parties had a contract through their term sheet and "[i]ts [c]ontract and [t]erms." [43] at p. 14. The Defendant further notes that in his deposition, Chad Moody admits that the parties executed two agreements: (1) a rate sheet and (2) a Cargo Claims Policy. The Defendant asserts that neither one of these documents served as a contract binding the Defendant to perform any services. The Defendant argues that there was no contract to perform any specific services between the parties and that, as a result, the Defendant cannot be held liable for any breach of contract claims.

In order to have a contract in Mississippi the following elements must be present" "'(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" *Beyond Capital Financial Management Group Inc. v. Byline Bank*, 2021 WL 4394265, at *7 (N.D. Miss. Sept. 24, 2021) (slip copy) (quoting *GGNSC Batesville, LLC v. Johnson*, 109 So.3d 562, 565 (Miss. 2013) (emphasis omitted) (internal citation omitted)). Here, the Plaintiff argues that the parties had a contract, but the only documents produced are the Rate Sheet and the Cargo Claims Policy. While each of these documents addresses various aspects of the parties' relationship, namely the prices the Defendant charges and the process by which the Plaintiff can place a claim for various delivery issues, neither document is sufficiently definite as to the terms of the services the Defendant was to render for the Plaintiff.

Specifically, the Defendant points out that neither of these documents required the Defendant to accept any pick-up orders placed by the Plaintiff. Further, the Plaintiff's corporate representative acknowledged that the Defendant had discretion to choose whether it would accept an order. Similarly, there was no contract provision that required the Plaintiff to solely use the Defendant's services nor was there a provision that required the Defendant to give the Plaintiff advance notice if it was not going to accept an order.

The Plaintiff argues that the opposite is true, that the alleged contract between the parties required the Defendant to give the Plaintiff 30 days' written notice before ending its services. Upon further review of the record, the 30-day provision to which the Plaintiff seemingly refers is found in the Cargo Claims Policy. This provision reads as follows:

> **Term:** The initial term of this Agreement shall commence on the Effective Date and shall continue thereafter for one (1) year (the "Initial Term. Unless terminated by either party as provided herein, this Agreement shall automatically renew for successive one (1)

> year periods (each such period, a "Renewal Term") (the Initial Term and Renewal Term(s), collectively, the "Term"). Notwithstanding the foregoing, either party may terminate this Agreement at the end of the Initial Term or any Renewal Term by providing thirty (30) days advance written notice to the other party.

[38], Ex. 1 at p. 54.

However, as the Defendant points out, the Cargo Claims Policy covers "the filing, processing, and disposition of *cargo claims* for all first to final mile . . . [s]hipments performed by [the Defendant], the Affiliates, and/or its' (sic) Affiliates' respective delivery agents[.]" *Id.* Therefore, the 30 days' notice to which the Plaintiff refers is not applicable to the Defendant's services as a whole but is rather applicable only to the Defendant's claims policy. The Court notes that the Plaintiff does not argue that the Defendant did not honor the time frame established for placing a claim. Rather, the Plaintiff argues instead that the Defendant could not refuse to accept an order without giving the Plaintiff notice of such.

As a result, the Court cannot find that there was an express contract as the Plaintiff suggests. While there were certainly documents governing the rate the Plaintiff would be charged to ship any orders it placed with the Defendant and the manner in which the parties handled any cargo claims the Plaintiff submitted to the Defendant, the Plaintiff's argument asks the Court to go much further. The Court declines to do so. The Defendant cannot be found liable for breaching an express contract when no such contract existed between the parties. The Court will therefore turn to the Plaintiff's argument regarding an implied contract.

     *b.*     *Breach of an Implied Contract*

"A contract that arises from the conduct of the parties, also known as a contract implied in fact, has the same legal effect as an express contract." *Triangle Construction Co, Inc.*, 218 So.3d at 1187 (quoting *Franklin v. Franklin ex rel. Phillips*, 858 So.2d 110, 120 (Miss. 2003) (citations

omitted)). "A contract implied in fact — also referred to as a quasi-contract — 'is an obligation created by law, in the absence of an agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience he ought not to retain and which in justice and fairness ought to belong to another.'" *Id.* (quoting *Franklin*, 858 So.2d at 120-21). A party's conduct helps to establish such a contract as "any conduct of one party from which the other party may draw the inference of a promise is effective as such and the conduct of the parties is viewed as a reasonable man would to determine the existence or not of the contract implied in fact." *Franklin*, 858 So.2d at 121 (internal citation omitted). In order to collect damages under a theory of contract implied in fact, "the claimant must show 'there is no legal contract but . . . the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another.'" *Id.* (internal quotation omitted).

Here, the Plaintiff argues that the parties had a contract implied in fact. Specifically, the Plaintiff argues that throughout their working relationship, the Defendant accepted every order the Plaintiff placed with it. Additionally, the Plaintiff asserts that the Defendant knew that its stock price would be affected if it informed its customers in advance that it would be stopping its FTFM services, and that the Defendant failed to notify its customers (including the Plaintiff) sooner in an effort to avoid upsetting the Defendant's shareholders. Lastly, the Plaintiff argues that the Defendant accepted orders and payment from the Plaintiff for deliveries that were to be made after the Defendant's FTFM services would no longer be operable. As a result, the Plaintiff argues that the Defendant breached the parties' implied contract by not giving the Plaintiff notice that the Defendant would no longer be accepting any orders the Plaintiff placed with it.

The Defendant again asserts that no contract existed between the parties, noting that the Plaintiff was not required to use the Defendant as its sole shipping provider nor was the Defendant required to accept any shipment orders from the Plaintiff. However, the Court notes that the Defendant does not dispute that it accepted every order the Plaintiff ever placed with it. In his Affidavit, the Plaintiff's corporate representative states that the parties worked together from September of 2018 to August 1, 2019. During this time, the Plaintiff placed several hundred orders with the Defendant each month. The Court sees it reasonable that, after placing hundreds, if not thousands, of orders with the Defendant and the Defendant accepting each of these orders, the Plaintiff could have interpreted the Defendant's conduct as an implied contractual agreement. *See Franklin*, 858 So.2d at 121. As a result, the Court finds that the Plaintiff has presented sufficient evidence on this point such that a material question of fact remains as to whether the parties had a contract implied in fact and, as a result, whether the Defendant breached any such contract.

The Defendant's request for summary judgment on this point is therefore denied. The Plaintiff will be permitted to proceed to trial on its implied contract claim.

III.    *The Plaintiff's claim for Breach of the Covenant of Good Faith and Fair Dealing*

In its Complaint [2], the Plaintiff asserts that the Defendant "represented it would comply with its established practice and prior dealings. In reality, Defendant knowingly took property and payment from Plaintiff with the expectation it would not perform its duty and/or obligations. Additionally, Defendant has knowingly kept property belonging to the Plaintiff." [2] at p. 4. The Defendant argues that summary judgment should be granted as to the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing because the Plaintiff cannot establish that the Defendant acted with bad faith and the Plaintiff cannot impose new contractual requirements

on the Plaintiff using the implied covenant of good faith and fair dealing. Each of the Defendant's arguments will be addressed in turn.[3]

    *a.*    *Establishing Bad Faith*

"All contracts contain 'an implied covenant of good faith and fair dealing in performance and enforcement.'" *Caplinger v. Whitney Bank*, 293 So.3d 307, 312 (Miss. Ct. App. 2020) (quoting *Univ. of S. Miss. v. Williams*, 891 So.2d 160, 170 (Miss. 2004); *Jones v. Miss. Insts. Of Higher Learning*, 264 So.3d 9, 18 (Miss. Ct. App. 2018), *cert. denied*, 263 So.3d 666 (Miss. 2019)). The Mississippi Supreme Court has defined good faith "as 'the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party.'" *Id*. (quoting *Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss. 1992)). Conversely, the Mississippi Supreme Court has defined bad faith "as requiring 'a showing of more than bad judgment or negligence; . . . bad faith implied some conscious wrongdoing because of dishonest purpose or moral obliquity.'" *Id*. (quoting *Williams*, 891 So.2d at 170-71 (internal citation and quotation marks omitted)).

In its Response Memorandum [43], the Plaintiff makes the following argument:

> Defendant knew or should have known such a sudden cessation of services would cripple the business of the Plaintiff, especially when Defendant knew for weeks or even months it was going to do so. Defendant was very knowledgeable of the fact it takes weeks to find and negotiate a new shipping carrier from its own conduct with the Plaintiff. Finally, Defendant purposefully hid its decision from its customers to satisfy its own selfish interest of stockholder happiness.

[43] at p. 16.

---

3    As was discussed above, this Court has found there not to be an express contract between the parties. As a result, any arguments the Plaintiff makes pertaining to an express contract are rejected.

The Plaintiff's corporate representative stated in his Affidavit that he "spoke with numerous Schneider representatives about why this was happening all at once . . . and I was told this decision was made several weeks prior, but was not announce it (sic) because it would cause harm to Schneider's stock price and they could not take a big hit." [42], Ex. 2 at p. 3. Similarly, the same corporate representative stated in his deposition that a former Schneider employee told him that the reason for not notifying the Plaintiff that the Defendant would be ceasing its FTFM services was to appease its shareholders. The Plaintiff contends that the Defendant acted in bad faith when it delayed notifying the Plaintiff of its intentions for this purpose.[4]

The Court again notes that, at this stage in the proceedings, it must view the evidence in the light most favorable to the Plaintiff. *See Little*, 37 F.3d at 1075. The Court has found that the Plaintiff has provided enough evidence to show that there is a question of fact as to whether an implied contract existed between the parties, and the Court hereby further finds that the Plaintiff has provided sufficient evidence at this stage of the proceedings as to whether the Defendant did not notify the Plaintiff in advance that it would be ceasing its FTFM services and that it delayed in doing so in bad faith. The Court will now turn to the Defendant's second argument on this point.

b.     *Imposing contractual terms for which the parties did not bargain*

The Defendant argues that the Plaintiff's claim under this theory also fails because the Plaintiff cannot use this theory to impose contractual terms to which the parties did not agree. As

---

[4]     The Defendant argues that, in making this argument, the Plaintiff relies on inadmissible hearsay which should not be considered. However, the Fifth Circuit has recognized that, at the summary judgment stage, evidence need not be presented in admissible form but, rather, only be *capable of* being presented in a form that would be admissible in evidence. *See Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017); *see also Trujillo v. Volt Management Corp.*, 846 F. App'x 233, 236 (5th Cir. 2021). The Court cannot find that the Plaintiff is incapable of presenting such testimony in admissible form and therefore rejects the Defendant's argument that such evidence should not be considered.

was analyzed above, the Court has already found that while there is no express contract regarding the Defendant's services, there is a question of fact as to whether an implied contract existed. If there were an implied contract between the parties, the Defendant could still be held to this covenant as the implied covenant of good faith and fair dealing is part of *every* contract. *See Hill v. Galaxy Telecom, L.P.*, 176 F.Supp.2d 636, 639 (N.D. Miss. 2001) ("In every contract there is an implied duty of good faith and fair dealing."). Therefore, the Defendant's argument that the Plaintiff cannot use this theory to hold the Defendant to contract terms to which it did not bargain is unsuccessful. Seeing as the Plaintiff has provided enough evidence to show that there is a question of fact as to whether the Defendant acted with bad faith and whether there was an implied contract between the parties, the Court finds that the Plaintiff has provided enough evidence to survive summary judgment on this point. As a result, the Defendant's request for summary judgment regarding the Plaintiff's claim for breach of the duty of good faith and fair dealing shall be denied.

*IV.    Applicability of the Carmack Amendment*

As noted above, the Defendant also raises a defense under the Carmack Amendment.[5] This argument specifically concerns the Plaintiff's claim for trespass to chattels or, in the alternative, conversion. Specifically, the Plaintiff argues that the Defendant accepted orders and payments from the Plaintiff without delivering some of those items to customers or returning those undelivered items to the Plaintiff. The Defendant argues that summary judgment is warranted on this claim because the Carmack Amendment applies, preempting the claim altogether.

---

5    The Carmack Amendment, codified in relevant part at 49 U.S.C. § 14706 *et seq.*, establishes a federal liability regime for claims concerning goods damaged or lost during transportation in interstate commerce.

"The Carmack Amendment establishes the standard for imposing liability on a motor carrier for the actual loss or injury to property transported through interstate commerce." *Heniff Transportation Systems, LLC v. Trimac Transportation Services, Inc.*, 847 F.3d 187, 189-190 (5th Cir. 2017) (citing *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013)). Under the Carmack Amendment, state law claims that rise out of an interstate carrier's shipment of goods are preempted. *Id.* at 190. "The purpose of the Amendment is to establish [] uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment." *Id.* (quoting *Distribuidora*, 738 F.3d at 706 (citations and quotations omitted)). "The Amendment 'provide[s] the exclusive cause of action for loss or damages to goods arising from the interstate transportation of those goods by a common carrier.'" *Id.* (quoting *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (emphasis omitted)). As the Court noted earlier in its accord and satisfaction analysis, any claims for trespass to chattels or conversion deal with the loss of a product. Seeing as damages for loss of product are covered under the Cargo Claims Policy, the Court finds that any claims for trespass to chattels and/or conversion were likewise subject to the accord and satisfaction. The Defendant's request for summary judgment as to these claims shall therefore be granted.[6]

*Conclusion*

For the reasons set forth above, the Defendant's Motion [38] for Summary Judgment shall be granted in part and denied in part. The Plaintiff shall be permitted to proceed to trial on its breach of implied contract claim (contained in Count I of the Plaintiff's Complaint) and its breach

---

6    Because the Court has granted summary judgment as to the Plaintiff's trespass to chattels and conversion claim, the Court need not address the Defendant's fifth summary judgment argument because that argument pertains solely to that claim.

of good faith and fair dealing claim (Count III of the Plaintiff's Complaint). The Defendant's motion for summary judgment as to those claims shall be denied. The Plaintiff, however, will not be permitted to seek damages for its remaining claims, which the Court found are subject to the parties' accord and satisfaction. The Defendant's motion for summary judgment as to those claims, for breach of an express contract (contained in Count I) and for trespass to chattels, or alternatively conversion (Count II), shall be granted and those claims dismissed.

SO ORDERED, this the 16 day of August, 2022.

SENIOR U.S. DISTRICT JUDGE